No. 2--04--1084                                            filed:
                                                           8/30/06
_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____
_____

THE PEOPLE OF THE STATE          )     Appeal from the Circuit Court
OF ILLINOIS,                     )     of Lake County.
                                 )
        Plaintiff-Appellee,      )
                                 )
v.                               )     Nos. 03--CM--6460
                                 )           03--DT--4237
                                 )
MARGARET A. COLEMAN,             )     Honorable
                                 )     Helen S. Rozenberg,
        Defendant-Appellant.     )     Judge, Presiding.
_____
_____

        JUSTICE O'MALLEY delivered the opinion of the court:

        Following a bench trial, defendant, Margaret Coleman, was convicted of battery (720

ILCS 5/12--3(a)(1) (West 2002)) and driving under the influence of alcohol.  In this timely

appeal, defendant argues that the State failed to prove battery beyond a reasonable doubt

because it did not establish that defendant's use of force was unjustified.  We affirm.

        Defendant was tried via bench trial beginning on July 14, 2004.  Tara Rittner testified

first for the State, and she testified as follows.  On September 16, 2003, at approximately 8

p.m., she and her husband, Ralph Rittner, were driving home from a childbirth class when

they approached the intersection of Route 176 and Waukegan Road, facing north.  The

traffic control device in the intersection was red as the Rittners pulled into the turn lane to

turn left onto Route 176. When the traffic control device indicated a green left-turn arrow, Ralph turned left. As the car turned left, Tara noticed a dark-colored sport utility vehicle resting in a corner gas station's parking lot exit facing Route 176. She assumed that the car would wait for them to pass before turning onto Route 176. However, after the Rittners made a "normal left turn," the sport utility vehicle "pulled right out in front of [them]." Tara estimated that the Rittners were traveling approximately 25 to 30 miles per hour as they completed the turn. Ralph attempted to stop and swerved to the right, but the Rittners' car hit the sport utility vehicle. The back end of the sport utility vehicle skidded to the side, and then the sport utility vehicle "kept going" before it stopped behind some cars at a red traffic light. Ralph asked Tara if she was alright and then exited the car to obtain the license number of the sports utility vehicle. She saw Ralph walk toward the other car and then, "the next thing [she] knew there was a scuffle." After the police arrived, and after Tara was placed in an ambulance for monitoring, she saw Ralph, who had a ripped shirt, scratch marks "all over his neck" and also on his chest and hand, and bite marks.

The State next called Ralph to testify, and he testified as follows. At approximately 8 p.m. on September 16, 2003, he was driving Tara home from a childbirth class. He had not consumed any alcohol on that day. He drove north on Waukegan Road and stopped in the left turn lane at the intersection of Waukegan Road and Route 176. His was the first car in the turn lane waiting for the traffic control signal to display a green turn arrow so that he could turn west on Route 176. There was a gas station on the northwest corner of the intersection. Once the traffic control device displayed the green arrow, Ralph turned onto Route 176 in the southern of two westbound traffic lanes. He estimated that he was traveling at 10 to 15 miles per hour as he made the turn. As he completed his turn, he saw

˘2˘

a sport utility vehicle pull out in front of him from the gas station parking lot. Ralph turned his steering wheel to the right and pressed his brakes, but he was unable to avoid hitting the other car. He made sure Tara was alright and then looked for the other car. The collision pushed the other car into the median area of Route 176. He saw it "slowly trail[] around into the eastbound traffic of Route 176 and [not] stop." The car continued "several hundred feet" before it was forced to stop at a red traffic light behind several other cars. On cross-examination, Ralph agreed that, if the car had not moved, it would have partially blocked eastbound traffic on Route 176. On redirect examination, Ralph recalled that the intersection at which the car stopped had two center lanes (for driving forward) and a left and a right turn lane and that defendant stopped in the left center lane at the red traffic light.

Ralph ran to the other car in order to see its license plate, and, once he got close enough, he knocked on the driver's side window of the other car to "tr[y] to make contact with the driver," whom he identified in court as defendant. He recalled having some trouble reading the license plate as he approached. Ralph yelled to defendant, " 'You hit us. You hit us. You can't leave.' " Defendant looked back at him with an expression of "surprise and shock." She rolled down her window, and Ralph noticed a "very strong odor of alcohol." Ralph repeated to defendant that she had hit him and needed to stop, and defendant looked at him and said " 'what, what did I do?' " Ralph repeated "several times" that she hit him, and defendant eventually began to step out of her car to assess the situation. As she stepped out of the car, it began to roll forward. Ralph "jumped into the car and slammed on the brakes and put the car in park and took the keys out, because [he]

didn't want the car to cause another accident and get somebody else hurt." At that point, several bystanders arrived and assured Ralph they would stand by until police arrived.

On cross-examination, Ralph stated that he told several officers that defendant exited her car without shifting the car into park, but he did not recall specifically which officers he told and which he did not. He acknowledged that his written statement to police did not reference defendant's exiting her car without shifting it into park. On cross-examination, he denied defense counsel's suggestion that he taunted defendant with her keys. On redirect examination, Ralph recalled that, after he stopped defendant's car and shifted it into park, he took the keys and told defendant that " '[he was] not giving these [keys] back until the police arrive[d].' "

Defendant was "a few feet" away from Ralph, and he noticed that she was slurring her words and not making "coherent sentences." She "demanded her keys because she was in the armed forces, and her commander needed the keys." She also threatened serious physical injury to Ralph if he refused to return her keys. Ralph "refused to give her the keys and let her flee." Defendant continued to implore Ralph to return her keys, and she made incoherent references to Tara. Ralph also noticed that defendant "wouldn't stand still" and was "shuffling her feet back and forth." Ralph had seen individuals under the influence of alcohol several times, and he concluded that defendant was "most decidedly intoxicated," based on "the smelling of alcohol on the breath, the *** staggering motions, slurred speech, [and the fact that she appeared] disoriented."

Defendant then "physically tried to remove the keys from [Ralph's] grasp." When that was unsuccessful, defendant "kind of pound[ed] on [his] arms with a fist" several times. When that was unsuccessful, defendant began pounding him with her fist and "scratching

at [his] neck." Defendant tore his shirt when she "grabbed the neckline and was trying to pull and whip [him] around." Defendant also tried to "gain leverage on [his] arm and kind of leaned down keeping her body in between [his] and the arm, and tried to [g]naw on [his] wrist." Though her teeth came in contact with his wrist, she did not break the skin. Ralph refused to give her the keys and told her he was trying to "stop another accident from happening." He stated that " '[they needed] to get this taken care of' " and that they would " 'get it taken care of when the police arrive.' " Defendant's responses to those statements were nonsensical and "garbled." On cross-examination, Ralph stated that some of the bystanders attempted to calm defendant, but that none of them physically intervened. He also acknowledged that he did not reference defendant's biting him in his written statement to police.

When police arrived, defendant "moved away from her car and actually ran across the eastbound lanes of Route 176" toward a forest area. An officer pursued her into the woods, and Ralph heard the officer "tr[ying] to get her to cool down."

Officer Robert Copeland testified next for the State, and he testified as follows. At approximately 8 p.m. on September 16, 2003, he was on patrol when he received a dispatch call indicating that a fight had broken out after a traffic accident, and he proceeded to the scene of the accident. When he arrived at the scene, he saw a male and a female engaged in "some type of fray." They separated when he pulled up, and he saw that the male's shirt was torn. Defendant's car was parked either in the left center lane or the left turn lane at an intersection.

The male began telling Copeland what had happened, and the female, whom Copeland identified as defendant, began walking away from the scene. It appeared that

defendant was fleeing the scene. Copeland yelled for her to stop, but defendant continued. Copeland ran after her and, when he caught her, asked her to return to the scene so that they could "sort this out." Defendant made a comment that she "had to go" and attempted to keep moving. Copeland told her she could not move any further, but defendant tried to continue to move. Copeland grabbed her arm, turned her around, and attempted to lead her back to the scene. Defendant tried to pull away from him, but she was not actively fighting him. Copeland did not recall exactly what defendant was saying at the time, but he stated that "[n]othing that she said made any sense." Defendant's speech was "mush mouthed," her eyes were red and glassy, and she had "a strong odor of alcohol about her." Copeland concluded that defendant was under the influence of alcohol that night.

When they arrived back at the scene of the accident, Copeland instructed defendant not to move, but she continued to try to walk away. Defendant "kept saying *** she had to leave," and she refused to remain seated. Police placed her in handcuffs, and she did not "give [them] any more trouble" after that. Copeland was able to read defendant's license plate without any difficulty. Copeland's contact with Ralph was limited.

Defendant testified on her own behalf, and she testified as follows. On the evening of September 16, 2003, defendant had "had a couple of small drinks," but she was not feeling any effects from the alcohol. On cross-examination, she estimated that she had less than two shots of vodka, and she finished her last drink 20 to 24 minutes before the incident. She drove to the gas station to purchase some items, and, after checking for traffic, she exited the gas station to travel west on Route 176. As she was turning, the Rittners' car impacted the rear of her car, causing it to fishtail into the eastbound lane. She came to a complete stop and tried to determine how to get out of traffic and return to the

gas station parking lot. She proceeded to an intersection and stopped behind other cars stopped at the red light. She stopped in the left center traffic lane. After a few seconds, a man she identified as Ralph began "pounding on [her] window and screaming at [her]." She informed him that she was trying to return to the parking lot, but Ralph "opened [her] car door and he grabbed the sleeve of [her] windbreaker with his fingers and [said] 'Oh no, you're not. You're not going anywhere. And you're trying to flee the scene of an accident.' " She then shifted the car into park, removed her seat belt, and "conceded" to get out of her car.

She walked to the back of her car to inspect the damage and then informed him that she could not see it and that she wanted to go to the gas station parking lot, where there was light. Ralph began yelling at her again and telling her that she was a drunk driver. He then ran up to the driver's door of her car, climbed inside the car, and started "feeling around on the dash, he turned the radio on, turned it off, turned the heater on, turned it off, started feeling around the seats." Defendant testified that she felt that Ralph may have been attempting to carjack her. She walked to the driver's door of her car and asked Ralph to get out of her car, and then she heard the jingle of her keys as Ralph disengaged her car engine. Ralph "elbow-butted" her in the chest and exited the vehicle with her keys in his hand. Ralph did not say anything as he ran to the rear of her vehicle. Defendant followed him and then, from "a socially acceptable distance," held her hand out and told him to return her keys. Ralph was "very manic, jumping around; it was very childish acting." He held the keys up and dangled them and told her, " 'You cannot have these keys back. These are mine now.' " Defendant replied that they were her keys and had her name on the dog tags attached to them, and Ralph replied, " 'Why? Are you a dog?' " She

explained that she was referring to her army dog tags and again requested that Ralph return the keys.  Ralph replied, " 'They're mine now and you're never going to get them back.' "  He turned and threatened to throw her keys into the woods.  Ralph then pulled out his shirt and shoved his hand, with her keys, underneath his shirt.  He began "bouncing around," saying, " 'Well, I just might shove them down my pants.' "

Ralph poked the longest key through his shirt, and defendant attempted to grab the key, but their skin never touched.  At that point, the police arrived.  She never bit, scratched, or hit Ralph.  Copeland told her to stand next to her vehicle, and she did so.

After considering the evidence, the trial court found defendant guilty of battery and driving under the influence.  Defendant timely appeals.

On appeal, defendant argues that the State failed to prove her guilty of battery beyond a reasonable doubt.  When faced with a challenge to the sufficiency of the evidence to convict, a reviewing court applies the reasonable doubt standard as set forth in People v. Collins, 106 Ill. 2d 237, 261 (1985).  People v. Campbell, 146 Ill. 2d 363, 374 (1992).  The relevant inquiry for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt.  Campbell, 146 Ill. 2d at 374.  A reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt.  Campbell, 146 Ill. 2d at 375.

Defendant argues that she was justified in using force against Ralph because he interfered with her lawful possession of her car. Indeed, "[a] person is justified in the use of force against another when and to the extent that [s]he reasonably believes that such conduct is necessary to prevent or terminate such other's trespass on or other tortious or criminal interference with *** personal property, lawfully in [her] possession." 720 ILCS 5/7--3 (West 2002). However, the State counters that Ralph's possession of defendant's keys was not tortious or criminal, because the evidence demonstrated that he was using justifiable force to make a citizen's arrest of defendant. We agree with the State.

"A private person who makes *** a lawful arrest is justified in the use of any force which he would be justified in using if he were summoned or directed by a peace officer to make such arrest ***." 720 ILCS 5/7--6(a) (West 2002). The State points out that the evidence shows that there were two bases under which Ralph could have justifiably applied reasonable force to prevent defendant from driving her car. First, defendant's actions indicated that she intended to flee the scene of the accident, in violation of section 11--402 of the Illinois Vehicle Code. 625 ILCS 5/11--402(a) (West 2002) ("The driver of any vehicle involved in a motor vehicle accident *** shall immediately stop *** [and] shall forthwith return to and in every event shall remain at the scene of such motor vehicle accident [until the drivers trade information and render any necessary aid]"). Ralph testified that, after the accident, defendant continued to drive until stopped by a red traffic signal. Defendant counters this testimony by arguing that she was forced to drive her car forward in order to move it out of the way of traffic and that Ralph confronted her before she had an opportunity to return to the gas station as she intended. However, though defendant claimed that she intended to return to the gas station parking lot, by her own admission she

proceeded not to a turn lane in order to circle back to the scene of the accident, but instead to one of two center lanes from which traffic could move only forward. Viewing the evidence in the light most favorable to the prosecution, we hold that there was ample testimony to establish that Ralph was justified in using force to prevent defendant from fleeing the scene.

The second basis for Ralph's use of force to detain defendant was that doing so prevented her from driving under the influence of alcohol. On appeal, defendant disputes this basis on the ground that Ralph's testimony, which supported a finding that defendant was intoxicated, was not credible. According to Ralph's testimony, before he took her keys, defendant emitted a strong odor of alcohol and slurred her words. He testified that he concluded that she was drunk.

Defendant points out that Ralph was in an agitated state during the incident and that his written report to police made no mention of biting or of having to stop defendant's car because she exited it without shifting it into park. However, the trial court apparently considered the testimony before it and found the State's witnesses to be more credible than defendant, and, as noted above, it is not our function to reassess the credibility of the witnesses. Further, even if we were to assess the credibility of the witnesses based on the record before us, we would find the State's witnesses to be more credible. We note that Copeland's observations of defendant at the end of the incident lent credibility to Ralph's conclusions. Indeed, all three of the State's witnesses offered consistent and believable accounts of the incident. Defendant, on the other hand, offered testimony that differed wildly from Ralph's, and she directly contradicted Copeland's recollections regarding her behavior after his arrival at the accident scene. Her explanation that defendant shredded

his own shirt by using her car key was also incredible. Viewing the evidence in the light most favorable to the prosecution, we agree with the State that the evidence established that Ralph was justified in using force to prevent defendant from driving under the influence.

Defendant does not argue that the amount of force Ralph employed would have been unjustifiable to stop defendant from fleeing or from driving under the influence, but rather that Ralph's applying any force was unjustifiable because defendant did not intend to flee or to drive under the influence. We reject those arguments above, and, in any event, we hold that the amount of force Ralph used, which, viewing the evidence in the light most favorable to the prosecution, consisted only of his holding defendant's keys until police arrived, was certainly justifiable under these circumstances.

For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

Affirmed.

BYRNE and CALLUM, JJ., concur.